# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 25-2630

GERSEN GABRIEL,
Appellant

v.

DSM BIOMEDICAL, INC.

_____

On Appeal from the U.S. District Court, E.D. Pa.
Judge Timothy J. Savage, No. 2:24-cv-04546

Before: BIBAS, CHUNG, and AMBRO, *Circuit Judges*
Submitted: June 23, 2026; Filed: August 13, 2026

_____

OPINION OF THE COURT

BIBAS, *Circuit Judge*. Title VII bans discrimination and retaliation, not stressful offices or difficult bosses. A black factory manager claims that a white executive discriminated against him by doing an extra safety audit, keeping his factory on a list of sites with safety problems, and being rude. But there is no evidence that any of these actions was motivated by race or even affected the terms of his employment. No law or employment term forbids having an intense or stressful workplace, and the actions fall short of creating a hostile work environment. Nor is there any evidence of retaliation; the only reasonable inference is that the employee was later suspended for texting two

(perceived) threats to an employee group chat. We will thus AF-FIRM the District Court's summary judgment for the employer.

## I. GABRIEL TAKES OFFENSE AT A RUDE EXECUTIVE

DSM is a European conglomerate with many divisions, including one for Health, Nutrition, and Care. One unit of that Health Division is DSM Biomedical. DSM routinely audits safety across its various sites (every three years for corporate operational audits, plus every year to year-and-a-half for peer-to-peer audits). It also keeps a list of the top ten sites company-wide that need safety improvements, using that list to monitor them and help them improve. The corporate Safety, Health, and Environment Department develops and proposes that top-ten list based on the number of injuries, injury rate, seriousness of incidents, and safety culture at each site. When one of the sites on the list falls within the Health Division, the Health Division President can veto the choice. But in practice, he always followed the Safety Department's recommendations about which sites to add or remove. In 2019, a DSM Biomedical factory in Pennsylvania was put on that list because of recurring safety problems; the Factory stayed on it through 2025.

In 2020, after the Factory was listed for extra safety help, Gersen Gabriel started work as DSM Biomedical's Senior Director of Operations. He managed the Factory and was responsible for safety there. His supervisor, friend, and mentor was DSM Biomedical's President.

The Factory had a routine corporate operational audit in 2021 and a routine peer-to-peer audit in 2022. At the start of 2023, DSM's CEO was concerned that the Factory had suffered two reportable injuries in a single month and both had been reported

2

late. So he asked for another, unannounced audit in 2023, ahead of the usual cycle. The Head of the Safety Department agreed and supplied an auditor from his own team. Though the audit praised the Factory's progress, it flagged several safety problems.

Gabriel, a black man, felt targeted by the Head of Safety, a white man. In mid-2022, the two met in person for the first and only time. Their meeting was "awkward." JA 115. Gabriel says the Head of Safety gave him a "weird" look, but at the time did not think it was related to his race. *Id.* In hindsight, Gabriel now thinks that interaction was related to his race, believing that the Head of Safety had been surprised to learn that a black man was in charge. He reevaluated that meeting based in part on later conversations with two other black employees and frustration that the Factory remained on the top-ten list. He also considered two incidents (one at the start of 2023, one a year later) when the Head of Safety had mistakenly criticized the Factory for failing to follow a safety policy.

At the start of 2024, after the second incident, DSM Biomedical's President asked human resources to investigate "bias against [the Factory] and in particular against Gersen [Gabriel] himself." Supp. App. 264. During that investigation, the President accused the Head of Safety of racial bias against black employees. The investigation found that the Head of Safety had been rude and intimidating and was guilty of a few "micro-aggressions or un-conscious bias comments" but no "blatant racial discrimination." JA 237.

DSM worried that these incidents could tempt Gabriel to leave. And it valued his work. So that spring, after DSM Biomedical's President announced that he was leaving for a new

employer, DSM offered Gabriel a $400,000 retention bonus. But Gabriel did not sign, believing that the bonus depended on his reconciling with the Head of Safety. He soon decided to leave DSM.

Matters came to a head in mid-June 2024. Gabriel got a formal job offer from the company that DSM Biomedical's President had just joined. Three days later, Gabriel filed an EEOC discrimination charge against DSM. He was slated to lead an important call with a major customer the following week. But he clashed with DSM Biomedical's new interim President over that call, leading the interim President to complain to human resources about Gabriel's conduct.

Gabriel did not take that complaint well. Feeling betrayed, he texted the DSM Biomedical leadership a link to a song called "Rat in mi Kitchen." Looking up the lyrics, the interim President understood them as threatening violence against the "rat," or betrayer, and feared he was being targeted. The next day, Gabriel texted the team a link to a video in which the speaker declares "war" against anyone who has been "scheming" against her.

When the Health Division President heard about the messages, he decided that Gabriel should no longer work for DSM Biomedical. The same day as the second text, DSM Biomedical suspended Gabriel with pay pending further investigation. Though the investigation was a necessary formality, the President saw the messages as beyond the pale; he had no plans to let Gabriel come back.

The same day that Gabriel was suspended, he accepted the other job offer. He then filed this lawsuit against DSM

4

Biomedical under Title VII, alleging racial discrimination by the Head of Safety and retaliation by DSM for filing his EEOC charge. The District Court granted DSM summary judgment on both claims. We review de novo, viewing the facts and drawing reasonable inferences in favor of Gabriel. *Tundo v. County of Passaic*, 923 F.3d 283, 286–87 (3d Cir. 2019).

## II. GABRIEL HAS NOT SHOWN ADVERSE ACTION OR A RACIAL MOTIVE

Under Title VII, to survive summary judgment, Gabriel bears the burden of making out a prima facie case of racial discrimination. *Qin v. Vertex, Inc.*, 100 F.4th 458, 473 (3d Cir. 2024). To do that, he must show that "he suffered an adverse employment action" in "circumstances that could give rise to an inference of intentional discrimination" based on his race. *Id.* (cleaned up). Though the adverse action need not cause "serious" harm, Gabriel "must [still] show some harm [to] an identifiable term or condition of [his] employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024); *accord* 42 U.S.C. §2000e-2(a)(1).

Gabriel fails twice over. Though he alleges discriminatory acts, none of them harmed an identifiable term of his job. And he points to no evidence that any of them was motivated by his race.

### A. None of the alleged discriminatory acts harmed a term of employment

Gabriel points to four alleged acts of discrimination. But he cannot show that any of them harmed an identifiable employment term. He notes DSM's keeping the Factory on the top-ten site list, the "barrage" of safety audits, the addition of another

5

supervisor to whom he reported, and the "intense pressure" he suffered from the Head of Safety's "bully[ing] [and] intimidati[on]." Appellant's Br. 19, 22 (cleaned up). He argues that each of these actions caused him "some harm." Appellant's Br. 22. But he skips over Title VII's separate requirement that they harm an identifiable term or condition of his employment.

We see no link to an identifiable term. There is no evidence that his job, salary, benefits, hours, perks, prestige, opportunities, or the like were tied to getting the Factory off the top-ten list. And no one with disciplinary authority over Gabriel even suggested that he should face consequences because the Factory stayed on the list. Nor was there any employment term against having a third audit within two and a half years, and the record does not reflect that the third audit had any impact upon any employment term. Finally, even if making Gabriel report to the Health Division's Head of Operations in addition to his regular supervisor inflicted "some harm" on the terms of Gabriel's employment, his claim still fails at the next step.

At bottom, Gabriel's claim rests on the "emotional harm" and "massive pressure" that he suffered working for a "bully." Appellant's Br. 22 (cleaned up). But that standard confuses his subjective harm with an objective condition of his employment. We do not doubt that the stressful workplace made Gabriel subjectively miserable. Nor do we doubt that, at some point, a workplace may become objectively intolerable, which itself violates a term of employment. But discrimination rises to that level only if it is "severe or pervasive" enough to amount to a hostile work environment. *See Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017). An even higher standard applies to constructive discharge. For that, a workplace must be objectively "so intolerable

that a reasonable person subject to them would resign." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (internal quotation marks omitted). In requiring only some harm for an adverse-action claim, *Muldrow* did not silently gut the high thresholds for claiming a hostile work environment or constructive discharge. Mere emotional harm and stress are not enough.

Gabriel's workplace, though stressful, did not meet Title VII's high bar for those types of claims. No incident was serious enough to rise to the level of "severe"—not even close. *Castleberry*, 863 F.3d at 264. In *Castleberry*, for instance, a supervisor threatened to fire employees and "[w]ithin the same breath" used the n-word. *Id.* at 265. Here, by contrast, no one used any racial slurs, made any racial comments, or otherwise harassed black employees. The most Gabriel can point to is one awkward meeting with the Head of Safety in mid-2022 that in hindsight he came to see as connected to his race, a couple of mistaken accusations of safety violations at the Factory, some abrasive remarks to other black employees, and one extra audit in the summer of 2023 that was ordered by the CEO, not the Head of Safety. The District Court got it right: "Sporadic instances of bullying or microaggressions by [the Head of Safety] do not rise to the level of a hostile work environment as a matter of law." JA 20. These incidents, spread across eighteen months, are also not pervasive. So Gabriel did not suffer an objectively hostile work environment, let alone constructive discharge.

Gabriel also raises a procedural objection. He objects that the District Court should not have rejected his hostile-work-environment and constructive-discharge theories sua sponte. And indeed, DSM Biomedical did not address either theory

7

until its reply brief below. But Gabriel briefed both theories in his response to DSM Biomedical's motion for summary judgment, relying on the same evidence of race-based discrimination that he used for his other disparate-treatment theories, and he discussed these theories at oral argument. He thus had enough notice and opportunity to be heard. *See* Fed. R. Civ. P. 56(f)(2); *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 223–24 (3d Cir. 2004).

### B. Plus, none of the alleged acts was racially motivated

Even if any of these actions did harm a term of employment, Gabriel crashes into another bar: He points to no evidence that any of them was motivated by his race. The first two audits were regularly scheduled and not alleged to be racially motivated, and the third was requested not by the allegedly biased Head of Safety but rather the CEO. Gabriel's reporting structure was changed by the Health Division President, not the Head of Safety. And when asked if that change was motivated by race, Gabriel testified that he "d[id]n't know." Supp. App. 86–87. Plus, the Factory was already on the top-ten safety list and stayed there because of persistent safety concerns. Gabriel suggests another explanation for why it stayed on the list—the Head of Safety's racial bias against him—but his evidence falls flat.

Gabriel's entire evidence of racial motivation boils down to a handful of abrasive interactions with the Head of Safety. But none supports a reasonable inference of intentional discrimination. Gabriel admits that he did not attribute his one awkward meeting with the Head of Safety to his race at the time; only in hindsight did he reinterpret it as surprise that a black man was in charge. And the handful of comments by the Head of Safety were

8

likewise insufficient to establish a prima facie case, like mistakenly accusing the Factory of safety violations or telling a black woman in a meeting, "If you are going to attack anyone, then attack me." JA 235. The Head of Safety was known as rude and abrasive in general, not just to black workers. Title VII does not ban mere rudeness or protect against abrasive bosses. The District Court properly found no evidence that any of the alleged disparate treatment (including the allegedly hostile work environment) was motivated by race. Summary judgment was proper on that claim.

### III. GABRIEL'S RETALIATION CLAIM FAILS TOO

Gabriel's Title VII retaliation claim fares no better. We spot him his prima facie case. *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015). His EEOC charge is indeed protected activity. *See id.* And we assume that, after *Muldrow*, his paid suspension pending investigation can count as an adverse action. We also assume that his suspension ten days after filing his charge is unusually suggestive of retaliation. *Lichtenstein v. Univ. of Pitt. Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (treating seven days as in the ballpark); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003) (suggesting that ten days could suffice).

In response, though, DSM Biomedical offers a legitimate, nondiscriminatory reason for suspending Gabriel: his (perceived) threats. He twice sent messages to a group chat that one member, whom he was clashing with, viewed as threatening. Threats, intimidation, and defying supervisory authority all violate DSM's code of conduct and are grounds for firing. Gabriel does not deny that. His only rejoinder is that the Health Division

9

President and suspension letter acknowledged the EEOC charge. But that is too little for a jury to "reasonably … disbelieve" DSM's explanation and "reasonably … believe that [retaliation] was more likely than not" a factor in suspending him. *Lynn v. Bank of N.Y. Mellon*, 180 F.4th 133, 145 n.10 (3d. Cir. 2026) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). So summary judgment was proper on Gabriel's retaliation claim too.

\* \* \* \* \*

Working at DSM Biomedical was doubtless stressful, and the Head of Safety was evidently abrasive and hard to work with. But neither fact shows race discrimination. And DSM properly suspended Gabriel for texting an employee group chat two messages that looked like threats. So we will AFFIRM summary judgment for DSM.

*Counsel for Appellant*

Evan L. Frank
ALAN L. FRANK LAW ASSOCIATES

*Counsel for Appellee*

Stephen H. Barrett
Joseph D. Guarino
Aurora Temple Barnes
Cherelle I. Glimp
DLA PIPER